**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BENJAMIN THOMAS IRWIN, and
ANGELA MARIE COLASANTI,

      Plaintiffs,

v.

HOLT INTERNATIONAL CHILDREN'S
SERVICES, INC.,

      Defendant.

**CIVIL ACTION NO.**
2:25-cv-05119-JMY

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT HOLT INTERNATIONAL CHILDREN'S SERVICES, INC.'S
<u>MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. RELEVANT BACKGROUND ......................................................................................... 2

    A. Plaintiffs step forward hoping to provide a future for a child without one.................. 2

    B. Holt presents Plaintiffs with its standardized, contract-of-adhesion IASA, containing a draconian and virtually indecipherable ADR procedure.................................................. 3

    C. Holt provides Plaintiffs with information concerning a prospective adoptive child ("K.R.") and does so either fraudulently or negligently. .................................................... 4

    D. Holt conducts a home study of Plaintiffs' household and presents Plaintiffs with additional pre-placement agreements. .................................................................................. 5

    E. Plaintiffs travel to Thailand to meet K.R. and are immediately thrown into crisis. ..... 6

    F. Plaintiffs exercise their contractual and legal right to disrupt, but Holt refuses to implement the required protections. .................................................................................... 7

III. LEGAL STANDARD....................................................................................................... 9

IV. ARGUMENT................................................................................................................. 11

    A. Pennsylvania law governs this dispute. ..................................................................... 11

    B. By their own terms, the Agreements make clear that Plaintiffs' claims are not subject to arbitration..................................................................................................................... 15

    C. Even if Plaintiffs' claims were deemed subject to arbitration, the arbitration clause is unconscionable, and the Court should not enforce it........................................................ 20

    D. Should the Court be inclined to enforce Holt's arbitration clause, the just solution is to transfer the case to the United States District Court for the District of Oregon, not dismiss it outright.............................................................................................................. 22

V. CONCLUSION............................................................................................................... 24

## I.  INTRODUCTION

A Pennsylvania couple engaged a Pennsylvania adoption service provider to help them potentially adopt a child from Thailand and bring the child home to Pennsylvania. Because of the adoption agency's misrepresentations and omissions concerning that child's health and behavioral complications, the adoption could not be finalized. Now, the agency seeks to drag that couple 3,000 miles away to Oregon—*a forum with no relationship whatsoever to this dispute*—to have their claims forced into an Oregon arbitration proceeding that is untethered to the facts and harm alleged.  That can't be right.

*First*, as a threshold matter, this dispute is governed by Pennsylvania law, not Oregon law, including with respect to the interpretation, validity, and enforceability of the subject agreements. While the agreements at issue contain Oregon choice-of-law clauses, such clauses are invalid if, as here, "(1) the chosen state has no substantial relationship to the parties or the transaction, or (2) if application of the law of the chosen state would be contrary to a policy of a state with a materially greater interest than the chosen state in the determination of the particular issue." *Cottman Transmission Sys., LLC v. Kershner*, 492 F. Supp. 2d 461, 466 (E.D. Pa. 2007). Both exceptions apply here, and Defendant's reliance upon Oregon law is therefore inapposite.

*Second*, Plaintiffs' claims are not subject to the alternative dispute resolution ("ADR") provision upon which Defendant relies. As Defendant admits, the relevant agreement "includes a provision" that expressly "excludes three categories of claims from [the] ADR procedure." Plaintiffs' claims fall within those categories, and Defendant's strained argument to the contrary should be rejected.  Moreover, in failing to provide Plaintiffs with a "Client Grievance Procedure" as required—which is not part of the record in this case—Defendant prevented Plaintiffs from ever getting to "step one" of the three-step ADR procedure, let alone "step three" (arbitration). And

there is nothing before the Court to support any argument that this contractual prerequisite to arbitration has been met.

*Third*, even if Plaintiffs' claims were subject to the ADR procedure, this Court need not—and should not—enforce that procedure because it is both unconscionable and a product of gross unequal bargaining power between the parties. The law is clear that one-sided arbitration clauses contained in contracts of adhesion, as here, may be invalidated on grounds of unconscionability. *See Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 264 (3d Cir. 2003) ("An agreement to arbitrate may be unenforceable based on a generally applicable contractual defense, such as unconscionability.").

*Finally*, if the Court were to nonetheless determine that Plaintiffs must ultimately proceed by way of binding, in-person arbitration 3,000 miles away in Lane County, Oregon, the Court should transfer this case to the United States District Court for the District of Oregon, not dismiss it altogether. *See* 28 U.S.C. § 1404(a).

## II.     RELEVANT BACKGROUND

### A.     Plaintiffs step forward hoping to provide a future for a child without one.

Plaintiffs Benjamin Irwin and Angela Colasanti are a Pennsylvania married couple who, beginning in 2020, sought to adopt a child from abroad through Defendant Holt International Children's Services, Inc. ("Holt"). ¶¶ 17, 43.[1] Like many families pursuing international adoption, they approached the process with care, hope, and a deep desire to provide a stable and loving home to a child in need. Holt is among the largest international adoption agencies on earth and is based in Eugene, Oregon, but maintains branch offices throughout the United States. ¶ 18. One of Holt's

---

[1] Unless otherwise indicated "¶" refers to paragraphs in the Complaint ("Compl.") (ECF 1); "Ex." to sealed exhibits to the Complaint; and "Mtn." to Defendant's Motion to Dismiss (ECF 9).

branch offices is in Bensalem, Pennsylvania. *Id.* Wanting to proceed through Holt's Thailand Special Needs Project—which Holt represents as offering children with only "minor to moderate" physical or developmental needs—Plaintiffs first contacted Holt in February 2020 and formally submitted their application to Holt on February 21, 2021. ¶¶ 2, 29, 43-45.

### B. Holt presents Plaintiffs with its standardized, contract-of-adhesion IASA, containing a draconian and virtually indecipherable ADR procedure.

On or around February 23, 2021, Holt provided Plaintiffs with its standardized contract, prepared by Holt, called an "International Adoption Services Agreement" ("IASA"). ¶¶ 44-45; Ex. 1. At the time Plaintiffs were presented with and executed the IASA, Plaintiffs had received no information about any prospective adoptee from Holt. ¶ 44.

The IASA required Holt to disclose all available medical, psychological, and historical information concerning a prospective adoptee and to make reasonable efforts to do so. ¶ 45; Ex. 1 ¶¶ 2.1, 7.2, 20.6; Mtn. at 2, 4. The IASA additionally sets forth the following ADR procedure:

> **15.1 Grievance Procedure**—Any and all complaints or claims by AP arising out of or relating to the terms or performance of this agreement must be presented and pursued in accordance with Holt's written "Client Grievance Procedure." ***A copy of the Client Grievance Procedure will be provided to AP when and if AP's application is accepted by Holt. The provisions of the Client Grievance Procedure are incorporated herein by this reference. Exhaustion of the Client Grievance Procedure, including all appeals, is a condition precedent to any further mediation or arbitration of AP's complaint or claim.*** Except as otherwise specifically provided in this agreement or in the Placement Agreement, any complaint or claim of AP which cannot be resolved by the Client Grievance Procedure, and any other dispute, controversy or claim arising out of or relating to the terms or performance of this agreement which cannot be resolved by good faith negotiation among the parties, must be resolved as specified in the following subsections.

(emphasis added).[2]

> **15.2 Mediation**—The parties agree to attempt in good faith to resolve any unresolved dispute, claim or controversy via mediation.

---

[2] Defendant omits the bolded text of Section 15.1—which includes key contractual language—in its Motion and substitutes an ellipsis. *See* Mtn. at 6.

**15.3 Arbitration**—If mediation fails to resolve the dispute, claim, or controversy it must be resolved by arbitration in Lane County, Oregon, pursuant to all applicable rules then in effect in the Circuit Court of Oregon for Lane County. . . . Any decision of the arbitrator must be reduced to and entered as final judgment in the appropriate Lane County Oregon court. Such award and judgment constitutes a final and binding adjudication of all matters submitted to arbitration. The parties expressly agree to waive any and all rights to appeal the arbitrator's decision. . . . .

Ex. 1, §§ 15.1-3.

The IASA automatically terminated upon Plaintiffs' later execution of the Placement Agreement. Ex. 1 § 14.2.

### C. Holt provides Plaintiffs with information concerning a prospective adoptive child ("K.R.") and does so either fraudulently or negligently.

On March 9, 2021, Plaintiffs indicated to Holt that, while they were interested in adopting a child through the Thailand Special Needs Project, they would not accept a child who had experienced physical or sexual abuse. ¶ 46. Plaintiffs also expressed to Holt that they were unable and unwilling to accept any child that exhibited severe or dangerous behaviors. ¶ 6. On March 13, 2021, Holt employee Zoila Lopez ("Ms. Lopez") reviewed with Plaintiffs various children on Holt's "Waiting Child List." ¶ 47. Ms. Lopez indicated to Plaintiffs that K.R. did not exhibit severe or dangerous behaviors. *Id.*

K.R. had been assessed in Thailand by Holt staff in November 2019. ¶¶ 41, 42. While in Thailand, Holt employees "assessed" 156 Thai children over the course of only twelve days. *Id.* Indeed, during the staff's November 2019 trip to Thailand, Holt employees responsible for assessing the children we made to work "nearly every waking hour of every day," going as far as to "assess" eighteen children in a single day. *Id.*

Holt "matched" Plaintiffs with "K.R.". ¶ 46. On March 15, 2021, Holt provided Plaintiffs with a "Child's History" form dated January 30, 2020, prepared by Ms. Lopez. ¶ 48. That form (inaccurately) represented to Plaintiffs that K.R. had no history of physical or sexual abuse and

that K.R.'s behavior was consistent with other children her age. ¶ 49. Holt also presented to Plaintiffs an internal memorandum that again (inaccurately) represented that K.R. did not exhibit severe or extreme behaviors. ¶ 51. Relying on these and other representations about K.R.—which Plaintiffs later learned to be false—Plaintiffs decided to move forward in the process of potentially adopting K.R. ¶ 52.

### D. Holt conducts a home study of Plaintiffs' household and presents Plaintiffs with additional pre-placement agreements.

Holt completed its first "home study" of Plaintiffs household on June 18, 2021. ¶ 56. Plaintiffs again informed Holt "that any child with severe behavioral challenges would pose a great risk to and likely retraumatize their previously adopted daughter" and that they could not care for such a child. *Id.* Holt nonetheless approved Plaintiffs for K.R.'s adoption on June 18, 2021, and Plaintiffs accepted Holt's referral of K.R. on June 22, 2021, reasonably expecting that K.R. may have only "minor to moderate physical or developmental special needs." ¶ 57.

Holt presented Plaintiffs with its standardized "Placement Agreement," prepared by Holt, which Plaintiffs executed on June 24, 2021. ¶ 58; Ex. 5.[3] The Placement Agreement obligated Holt to assume responsibility—both under U.S. regulations and the contractual language itself—for planning and securing appropriate care in the event of a disruption. ¶¶ 53-54, 58-60, 64-65. Plaintiffs were never told that Holt was not licensed in Pennsylvania to provide the foster or institutional care referenced in these agreements. ¶ 59. While the IASA terminated upon Plaintiffs' execution of the Placement Agreement, the Placement Agreement incorporates the IASA. ¶ 60; Ex. 5 ¶ 2. The Placement Agreement with which Plaintiffs were ultimately presented was totally

---

[3] Earlier, in March 2021, Holt also provided a document to Plaintiff called the "Holt Family Service Plan." ¶ 53; Ex. 4. That document required Holt to "[w]hen necessary because of a disruption before final adoption, assum[e] custody of [the] child and provid[e] or facilitate[e] the provision of childcare or any other social service pending an alternative placement." *Id.*

different (in form and in substance) from what they had been originally given by Holt along with the IASA. *See* ¶¶ 62-63.

Throughout this period, Holt's disclosures continued to omit any indication that K.R.'s true psychiatric and behavioral profile involved severe, dangerous, or extreme behaviors—information that was plainly material to Plaintiffs and that Holt either possessed or should have known. ¶¶ 6-11, 47-52, 68-70.

### E.    Plaintiffs travel to Thailand to meet K.R. and are immediately thrown into crisis.

Plaintiffs arrived in Thailand on April 22, 2023. ¶¶ 71-72. Within days of meeting K.R., they encountered behaviors wholly inconsistent with Holt's prior disclosures. Within the first two weeks, K.R. attempted to strangle Plaintiffs, attempted to jump off an eleven-story balcony, repeatedly engaged in self-harm, attempted to run away, destroyed property, and terrorized Plaintiffs' daughter to the point of trauma. ¶¶ 6-11, 71-80, 93-97.

Plaintiffs reported these events to Holt in real time. Holt repeatedly minimized the behavior, instructed Plaintiffs to ignore it, and asserted that Plaintiffs were K.R.'s "last chance" and "only hope." ¶¶ 8-11, 88-96. Holt further falsely represented that Plaintiffs would be required to finalize the adoption in order to secure K.R.'s immigration status—a statement later shown to be untrue, as K.R. became a lawful permanent resident upon entering the United States. ¶¶ 11, 89-92, 98. Given Holt's pressure, the coercive statements made, and the fear of returning K.R. to the unsafe orphanage environment, Plaintiffs made the difficult decision to bring her to the United States on May 10-11, 2023 to begin the six-month probationary period required under Thai law. ¶¶ 93-98; *see also* ¶ 63 n.8.

### F. Plaintiffs exercise their contractual and legal right to disrupt, but Holt refuses to implement the required protections.

Within days of arriving home, K.R.'s violent and dangerous behaviors escalated substantially, becoming more frequent, extreme, and severe, and her medical conditions became much more noticeable. Plaintiffs were forced to bring her to the Children's Hospital of Philadelphia ("CHOP") on May 14, 2023, leading to an 11-day psychiatric hospitalization and new diagnoses of severe psychiatric conditions as well as latent tuberculosis. ¶¶ 99-106. Throughout this time, Holt—despite having an office less than an hour from CHOP—never visited K.R., never evaluated her, and never pursued the medically recommended group home placement. ¶¶ 113-116.

After discharge, K.R. remained in Plaintiffs' home for approximately one month. During that period, she engaged in daily, escalating violence and self-harm, including sexualized behavior toward Ms. Colasanti, attacks on Plaintiffs while they slept, multiple attempts to obtain weapons, attempts to push Mr. Irwin down stairs, and efforts to jump from a second-story banister. ¶¶ 107-112. Plaintiffs repeatedly notified Holt and requested an alternative placement plan. Holt provided none. ¶¶ 108, 113-116.

Beginning June 23, 2023, K.R. cycled through four more psychiatric hospitalizations, first at Pottstown Hospital, then CHOP again, then Lehigh Valley Health Network, and finally Western Psychiatric Hospital in Pittsburgh. ¶¶ 117–141. Physicians at Western Psychiatric ultimately determined that K.R.'s extreme behaviors constituted her *baseline functioning*. ¶¶ 135-138.

During this period, Plaintiffs notified Holt—in three separate written disruptions (June 28, July 13, and July 25)—that they were terminating the placement as permitted by contract and Thai law. ¶¶ 120, 126-127. Holt refused to take custody, refused to identify any alternative placement, refused to forward Plaintiffs' repatriation requests to Thai authorities, and provided a "Disruption Services Agreement" that sought to impose all foster-care costs on Plaintiffs without supplying

any placement plan. ¶¶ 121-125. Holt then instructed Plaintiffs not to sign the very agreement it had produced. ¶ 121.

After a four-month inpatient hospitalization, K.R. was transported in December 2023 to Woods Services, a residential treatment facility in Langhorne, Pennsylvania (the only placement available and one acknowledged to be inadequate for her long-term needs). ¶¶ 141-142, 150. She remains there today on a temporary basis. K.R. will likely become a ward of the Commonwealth of Pennsylvania, with her long-term care being funded entirely by Pennsylvania taxpayers. *See* ¶ 156; Mtn. at 15.

Meanwhile, in November 2024, the Thailand Department of Children and Youth—acting as the Thai Central Authority under the Hague Convention—explicitly directed Holt to assume legal guardianship of K.R., provide for her care and treatment, and identify a suitable adoptive placement. ¶¶ 148-149. Holt has not complied.

As a result of Holt's conduct, Plaintiffs were left with no viable alternative but to seek judicial relief. Despite Plaintiffs' repeated pleas for assistance, Holt refused to assume custody, refused to identify or secure an appropriate alternative placement, refused to carry out the responsibilities it undertook by contract and under applicable law, and instead continued to delay, deflect, and shift responsibility back onto Plaintiffs long after they had unequivocally disrupted the placement. ¶¶ 13-16, 108-116, 120-127, 139-149, 151-153.

In the meantime, Plaintiffs have suffered profound and ongoing harm, including extreme emotional distress, severe financial strain, disruption to their employment and family life, exposure to threatened criminal and dependency proceedings, and the lasting trauma inflicted on their household by Holt's misrepresentations and abandonment during repeated medical and psychiatric crises. ¶¶ 1, 12-16, 112-113, 128, 150-153. More than two years after Plaintiffs exercised their

contractual and legal right to disrupt, Holt still has not fulfilled its obligations to K.R. or to Plaintiffs, leaving all parties in untenable limbo and leaving Plaintiffs with no recourse other than this action. ¶¶ 14-16, 148-153.

## III. LEGAL STANDARD

When faced with a motion to compel arbitration, the Court must first decide whether to apply the standard of review set forth in Federal Rule of Civil Procedure 12(b)(6) or Rule 56. *See Sanford v. Bracewell & Guiliani, LLP*, 618 Fed. App'x 114, 117 (3d Cir. 2015).[4] "Where the affirmative defense of arbitrability of claims is apparent on the face of the complaint (or . . . documents relied upon in the complaint), the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery." *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 773-74 (3d Cir. 2013) (cleaned up).

However, pre-arbitration discovery has been allowed to determine whether an arbitration clause is unconscionable. *See Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 284 (3d Cir. 2004) (remanding for "the development of a record" to determine whether arbitration would be prohibitively expensive, because "an arbitration provision that makes the arbitral forum prohibitively expensive for a weaker party is unconscionable."). Likewise, "any time the court must make a finding to determine arbitrability, pre-arbitration discovery may be warranted." *Guidotti*, 716 F.3d 775 n.5. Here, because Plaintiffs contest the validity, enforceability, and scope

---

[4] Plaintiffs acknowledge that, because the Federal Arbitration Act ("FAA") precludes this Court from entering an order compelling arbitration outside this judicial district, Defendant's Motion has been properly brought under Rule 12(b)(6) as opposed to under 9 U.S.C. § 4. In any event, the Motion's substance, and not its form, supplies the appropriate standard. *See Maggi v. Int'l Travel Network, LLC*, 2025 WL 929401, at *1 (D. Del. Mar. 27, 2025) ("Although [Defendant] calls its motion a 'Motion to Dismiss,' the motion's substance is a motion to compel arbitration . . . . So I treat it as one.").

of the arbitration clause at issue, Plaintiffs respectfully submit that limited discovery on those questions is appropriate.[5] In that case, once the "non-movant has come forward with enough evidence in response to the motion to compel arbitration" the summary judgment standard would apply. *Id.* at 774.

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *see also Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In the context of a motion to compel arbitration, Rule 12(b)(6) requires that courts "examine whether there can be no reading of the Complaint that could rightly relieve Plaintiff of the arbitration provision." *Parker v. Briad Wenco, LLC*, 2019 WL 2521537, at *2 (E.D. Pa. May 14, 2019), *report and recommendation adopted*, 2019 WL 2516059 (E.D. Pa. June 18, 2019). The court examines "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The court must accept all factual allegations as true and construe the complaint in the light most favorable to Plaintiffs. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Finally, to the extent the court is called upon to decide the validity of the agreement to arbitrate, "any ambiguity must be construed against the drafter of the contract." *Lawson v. City of Philadelphia*, 2019 WL 934976, at *6 (E.D. Pa. Feb. 25, 2019) (denying motion to compel arbitration where "provision's language

---

[5] Defendant asserts that "Plaintiffs do not contest the enforceability of the parties' arbitration agreement[.]" Mtn. at 11. How Defendant arrived at that conclusion is a mystery. In asserting that Plaintiffs have somehow conceded that the arbitration clause is enforceable, Defendant cites to paragraph 61 of the Complaint. But that paragraph simply discusses the ADR procedure's relevant carve-out. For avoidance of doubt, Plaintiffs do contest the enforceability of the arbitration clause, and nothing in the Complaint suggests otherwise.

[was] entirely too ambiguous to constitute a clear and unmistakable agreement by the parties to resolve disputes by arbitration alone, and [was] therefore not enforceable").

## IV. ARGUMENT

### A. Pennsylvania law governs this dispute.

Initially, the Court must determine which law applies. *See MacDonald v. CashCall, Inc*, 883 F.3d 220, 228 (3d Cir. 2018) ("As a threshold matter, we must determine what substantive law governs our interpretation" in the context of deciding enforceability and scope of arbitration clause). Defendant's Motion does not address the issue but merely assumes Oregon law applies, relying upon the IASA. Mtn. at 11. The IASA contains an Oregon choice-of-law clause, reproduced in pertinent part below:

> **15.5 Choice of Law and Venue**— This agreement – including all supplements, modifications, and other documents incorporated herein – and all rights, obligations, and disputes arising out of it is governed by and construed consistent with Oregon law.

Ex. 1 § 15.5.[6]

Both the IASA and the Placement Agreement are silent as to any given state's choice-of-law principles. Generally, "[w]hen an agreement contains both a choice-of-law clause and an arbitration clause, the reviewing court will apply the substantive law of the state named in the choice of law clause." *Ebner v. Fin. Architects, Inc.*, 763 F. Supp. 2d 697, 700 (D. Del. 2011). But where an agreement's choice-of-law provision is invalid, the forum state's substantive contract law applies to interpretation of an arbitration agreement. *See MacDonald*, 883 F.3d at 228. Similarly, to determine the validity of the choice-of-law provision in the first instance, the law of the forum state applies. *See Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) ("[I]nasmuch

---

[6] The Placement Agreement purports to incorporate this provision by reference. *See* Ex. 5 at § 2.

as [plaintiff] argues that Pennsylvania law governs the arbitration provision and the Agreement as a whole, it seems reasonable to use Pennsylvania law in evaluating the choice-of-law provision."); *see also id.* (explaining that, if the district court's jurisdiction had "been based on diversity of citizenship of the parties we would apply Pennsylvania's choice-of-law principles as the court was in the Eastern District of Pennsylvania.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).

Under Pennsylvania law, a choice-of-law clause is invalid where: "(1) the chosen state has no substantial relationship to the parties or the transaction, or (2) if application of the law of the chosen state would be contrary to a policy of a state with a materially greater interest than the chosen state in the determination of the particular issue." *Cottman Transmission Sys., LLC v. Kershner*, 492 F. Supp. 2d 461, 466 (E.D. Pa. 2007); *see also Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Schifano v. Schifano*, 471 A.2d 839, 843 (Pa. Super. 1984)).

Here, the chosen state (Oregon) has virtually no relationship to the parties or the transaction at all, let alone a "substantial" relationship. At all relevant times, Plaintiffs have lived in Pennsylvania. Holt conducted its home studies of Plaintiffs' household in Pennsylvania. K.R. was always to be placed with Plaintiffs in Pennsylvania, and she remains in Pennsylvania. All harm suffered by Plaintiffs (economic, emotional, or otherwise) as alleged in the Complaint has been suffered by them in Pennsylvania. Holt maintains the involved branch office in Pennsylvania. Holt employees based in Pennsylvania facilitated K.R.'s placement with Plaintiffs in Pennsylvania. Holt has voluntarily appeared in dependency proceedings concerning K.R. in Pennsylvania and continues to attend meetings with Pennsylvania government agencies with respect to K.R.. There is no allegation in the Complaint—***none***—concerning any event, transaction, communication, or

operative fact tying this dispute in any meaningful way to Oregon. That alone is enough for this Court to refuse to enforce Section 15.5 of the IASA.

Even if the Court were to determine that Holt's maintaining its principal place of business in Oregon (and nothing more) is enough to create a "substantial relationship" between that forum and this dispute, the inquiry does not end there. Because Pennsylvania has adopted Section 187 of the Restatement, (Second) of Conflict of Laws, the Court "must determine whether [Pennsylvania] has a materially greater interest in this case than [Oregon]." *SKF USA Inc. v. Okkerse*, 992 F. Supp. 2d 432, 439 (E.D. Pa. 2014). If so, the Court "must decide whether application of [Oregon] law would be contrary to a fundamental public policy of [Pennsylvania]." *Id.* In sum, "Pennsylvania applies a flexible rule which permits analysis of the policies and interests underlying the particular issue before the court and directs courts to apply the law of the state with the most interest in the problem." *Am. Guarantee & Liab. Ins. Co. v. L. Offs. of Richard C. Weisberg*, 524 F. Supp. 3d 430, 443 (E.D. Pa. 2021) (cleaned up).

In the first step—to determine which state has a materially greater interest in the case—the Court must "determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply." *UPMC v. CBIZ, Inc.*, 436 F. Supp. 3d 822, 834 (W.D. Pa. 2020). Such a difference exists here between Pennsylvania and Oregon law. Plaintiffs' claims sound largely in tort and in the nature of "wrongful adoption" or "negligent placement of adoptive child." *See generally Gibbs v. Ernst,* 647 A.2d 882 (Pa. 1994); *Lord v. Living Bridges*, 1999 WL 562713 (E.D. Pa. July 30, 1999); ¶¶ 166-182; 196-210; 239-255. In *Gibbs*, the Pennsylvania Supreme Court explained that "[t]he adoption agency—adopting parent connection is, or should be, one of trust and confidence, differing significantly from a business arrangement." *Gibbs*, 647 A.2d at 893. The *Gibbs* court ultimately held that Pennsylvania "must recognize application to the adoption

context of longstanding common law causes of action grounded in fraud and negligence." *Id.* at 894; *see also id.* at 884 ("The sole issue presented before this Court is whether the law of the Commonwealth recognizes as causes of action Wrongful Adoption and Negligent Placement of Adoptive Child.").

In reaching its conclusion, the *Gibbs* court identified several affirmative duties to which Pennsylvania adoption agencies[7] are subject, including: (i) the duty to "make reasonable efforts to determine whether its representations are true" (*id.* at 891); and (ii) the duty "to disclose fully and accurately to the adopting parents all relevant non-identifying information in its possession concerning the adoptee" (*id.* at 892). Notably, although the *Gibbs* decision makes clear that an adoption agency does not have a duty to conduct "a comprehensive investigation into the background of a child," *id.* at 894, the decision makes equally plain that adoption agencies do retain some lesser duty of investigation. *See id.* at 890 (noting that party may be liable for negligent misrepresentation where it "fail[s] to make reasonable investigation of the truth" of its representation); *id.* at 891 (holding that adoption agency is required to "make reasonable efforts to determine if their statements are true").

Oregon has no such law. Indeed, Plaintiffs have been unable to identify any Oregon caselaw applying common law causes of action grounded in fraud and negligence in the adoption context (and certainly not in a manner that would recognize a cause of action for "wrongful adoption"). To the contrary, based on Plaintiffs' research to date, authorities on the matter suggest that Oregon would not recognize such claims. *See Allen v. Allen*, 330 P.2d 151 (Or. 1958)

---

[7] *See* 23 Pa.C.S. § 210 (defining "agency" as "[a]ny incorporated or unincorporated organization, society, institution or other entity, public or voluntary, which may receive or provide for the care of children, supervised by the Department of Public Welfare and providing adoption services in accordance with standards established by the department.").

(rejecting adoptive parents' claims for monetary damages against agency, even in the case of fraud).

Pennsylvania, on the other hand, has a fundamental "policy of ensuring that adoptive parents, as do prospective natural parents, have an opportunity to make an intelligent, informed decision before assuming the burden of parental responsibility." *Gibbs v. Ernst*, 615 A.2d 851, 855 (Pa. Cmwlth. 1992), *aff'd in part, rev'd in part on other grounds*, 538 Pa. 193, 647 (1994). To that end, the Pennsylvania Supreme Court has announced "a policy in favor of full and accurate disclosure of a child's medical history" in the adoption setting. *Gibbs*, 647 A.2d 882 at 887. Similarly, the Pennsylvania Supreme Court has announced that "Pennsylvania plainly has a strong interest in ensuring that relatives do not leave their disabled family members at private Pennsylvania facilities in such a way that those facilities are forced to incur substantial uncompensated expenses on an indefinite basis." *Melmark, Inc. v. Schutt by & Through Schutt*, 206 A.3d 1096, 1109 (Pa. 2019). Through its unlawful conduct, Holt has created precisely that scenario, forcing K.R. to reside at a Pennsylvania residential treatment facility indefinitely and harming Pennsylvania Plaintiffs (and K.R.) in the process. In light of the "policies and interests underlying the particular issue before the court" Pennsylvania, not Oregon, clearly has "the most interest in the problem" and its laws should govern this dispute notwithstanding the choice-of-law provision on which Holt relies. *Am. Guarantee & Liab. Ins. Co.*, 524 F. Supp. 3d at 443.

### B. By their own terms, the Agreements make clear that Plaintiffs' claims are not subject to arbitration.

"At its heart, arbitration is a matter of contract." *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 328 (E.D. Pa. 2004). It thus follows that no party can be "required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). "The FAA requires courts to 'enforce arbitration agreements

according to their terms.'" *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018)).

Under both federal and Pennsylvania law, the Court may grant Holt's motion "to enforce an arbitration provision", Mtn. at 10, only if it "finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement." *Miron*, 342 F. Supp. 2d at 328 (E.D. Pa. 2004) (citing *McAlister v. Sentry Ins. Co.*, 958 F.2d 550, 553 (3rd Cir.1992)). While the presumption in favor of arbitrability is strong, a party may overcome that presumption by "establish[ing] the existence of an ***express provision excluding the grievance from arbitration***." *Miron*, 342 F. Supp. At 329 (emphasis added). Holt's arbitration clause fails on multiple fronts.

First, as set forth above (*see* pages 3-4, *supra*), the IASA purports to subject Plaintiffs to a "three-step ADR procedure." Mtn. at 6. Those "steps" are: (i) a "Client Grievance Procedure"; (ii) mediation; and (iii) arbitration. Step one, however, was never made available to Plaintiffs, and Plaintiffs therefore could not have proceeded to mediation or arbitration. Section 15.1 of the IASA provided that "[a] copy of the Client Grievance Procedure will be provided to [Plaintiff] when and if [Plaintiffs'] application is accepted by Holt." Ex. 1 § 15.1. Holt accepted Plaintiffs' application on June 18, 2021, *see* ¶ 57, but Holt did not provide Plaintiffs with any document entitled "Client Grievance Procedure." ***Nor has any alleged "Client Grievance Procedure" been made a part of the record in this case***. Because "[e]xhaustion of the Client Grievance Procedure, including all appeals, is a ***condition precedent*** to . . . mediation or arbitration" under the IASA, Plaintiffs never could have proceeded to arbitration even if the ADR procedure otherwise applied to their claims

(which, as explained below, it does not). Ex. 1 § 15.1 (emphasis added).[8] There is no basis for the Court to conclude that this prerequisite to arbitration has been met. For purposes of Defendant's Motion, the terms of the "Client Grievance Procedure" are unknown and purely speculative. Defendant fails to address the issue at all.

Read charitably, Defendant may be (incorrectly) referring to the "Client **Complaint** Procedure" (*i.e.*, not the contractually required "Client **Grievance** Procedure") that was appended to the IASA. But, even if so, that procedure did not apply to Plaintiffs at the time they filed their Complaint. *See* Ex. 1, p. 14 of 25.[9] The Client Complaint Procedure defines "client" to mean any "birth parent, prospective adoptive parent or adoptive parent, or adoptee." *Id.* Plaintiffs are not now, nor were they at the time they filed their Complaint, "clients" subject to the Client Complaint Procedure, because the prospective adoption by that time had been disrupted and ended (*i.e.*, Plaintiffs were no longer "prospective adoptive parent[s]"). Moreover, not even the Client Complaint Procedure was provided to Plaintiffs when their "application was accepted by Holt." Ex. 1 § 15.1. The arbitration inquiry should stop there.

Second, as the Complaint explicitly sets forth (¶ 61), the Placement Agreement forecloses Holt's attempt to compel arbitration for a simple reason: the Placement Agreement itself expressly limits the scope of any arbitration (or other alternative dispute resolution) obligation, and Plaintiffs' claims fall outside those limits. *See* ¶ 61. Section 10.9 of the Placement Agreement provides as follows:

> 10.9 <u>Dispute resolution</u> Because the well-being of a child may be at stake, any disruption, initiated by either party, of an adoptive placement exercised in

---

[8] Again, Defendant conveniently omits this language from its Motion when it provides the language of Section 15.1, substituting an ellipsis. *See* Mtn. at 6; *see also supra* note 2.

[9] Defendant does not cite to this document when referring to the "Client Grievance Procedure" presumably because they are two different documents.

accordance with this agreement is not subject to the grievance and dispute resolution procedure contained in the International Adoption Services Agreement ("the grievance and dispute resolution procedure"). Similarly, any litigation or dispute with regard to custody or guardianship of the child that may arise out of any disruption or termination of this agreement, and AP's financial obligations with regard to the child under Sections 5 and 8.2 of this agreement are not subject to the grievance and dispute resolution procedure. However, any claim by AP for damages attendant to or arising out of any disruption or termination of this agreement remains subject to the grievance and dispute procedure.

Ex. 5 § 10.9.[10]

As Defendant acknowledges, Section 10.9 "excludes" certain claims from the ADR procedure. Plaintiffs have pleaded facts that place their claims squarely within those exclusions. For example, Section 10.9 is explicit that "***any litigation*** or dispute ***with regard to*** custody or guardianship of the child that may arise out of any disruption or termination of this agreement" (*i.e.*, the Placement Agreement) is "not subject to the grievance and dispute resolution procedure." *Id.* (emphasis added). Plaintiffs' claims in this litigation are unquestionably "with regard to" custody and guardianship of K.R. and arise out of, in part, disruption or termination of the Placement Agreement (in other words, termination or disruption of the adoptive placement itself). The final sentence of Section 10.9—explaining that claims "for damages attendant to or arising out of any disruption of termination of" the Placement Agreement—does not change this analysis. That sentence addresses a distinct category of claims: stand-alone damages claims divorced from custody or guardianship disputes. It does not sweep back into ADR claims that the preceding sentence expressly removes from it, nor does it permit Defendant to recharacterize litigation "with regard to" custody and guardianship as a damages claim merely because Plaintiffs seek monetary relief. Read as a whole, Section 10.9 reflects the parties' clear intent to exclude from ADR disputes

---

[10] See Mtn. at 6-7. In its Motion, Defendant also reproduces the text of Section 10.9. Where it does so, however, it has added bracketed numerals [1], [2], and [3] within the text. To be clear, that enumeration does not appear in the text of the agreement.

implicating the disruption of an adoptive placement and the resulting custody or guardianship issues—precisely the claims Plaintiffs assert here. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 173 (3d Cir. 2014) ("In assessing whether a particular dispute falls within the scope of an arbitration clause, we focus on the factual underpinnings of the claim rather than the legal theory alleged in the complaint.") (cleaned up).[11]

Moreover, and alternatively, Plaintiffs' non-contractual claims do not fall within the scope of the IASA's ADR procedure, and arbitration is not required as to those claims. By its terms, the grievance procedure applies only to claims "arising out of or relating to the terms or performance of this agreement." Ex. 1 § 15.1. Certainly, plaintiffs' separate tort and statutory claims (e.g., causes of action 2-7 and 9-12 of the Complaint) are based on claims under common law or statute, and not on any contractual duties of Holt. They are independent of any contractual breach by Holt. Accordingly, these claims should be litigated in court and are not required to proceed in arbitration under the contracts at issue.

---

[11] In offering its interpretation of Section 10.9, Defendant engages in nothing less than textual gymnastics, bending the clause past recognition to force Plaintiffs' claims into a process the contract expressly excludes. *See* Mtn. at 14 n.3. Defendant's argument rests on a fundamental mischaracterization of Plaintiffs' claims. Plaintiffs do not seek damages simply because the placement was disrupted; they seek redress for Holt's misconduct that preceded, caused, and followed that disruption—including misrepresentations, omissions, coercive pressure, abandonment during escalating crises, and refusal to assume custody and guardianship responsibilities triggered by termination of the placement. Those claims are, at their core, "with regard to custody or guardianship of the child" and, at least as to the contract-based claims, arise directly out of the disruption or termination of the Placement Agreement, placing them squarely within the express exclusions of Section 10.9. Defendant's attempt to re-label these excluded disputes as "damages claims" because Plaintiffs seek monetary relief would nullify the exclusion entirely and collapse the distinction Section 10.9 carefully draws between custody- and placement-related disputes and the narrow residual category of stand-alone damages claims. Contract interpretation does not permit such a result, and the Court should reject Defendant's effort to rewrite the parties' agreement through post hoc recharacterization.

**C.** **Even if Plaintiffs' claims were deemed subject to arbitration, the arbitration clause is unconscionable, and the Court should not enforce it.**

An arbitration agreement may be invalidated where there is a legal or equitable ground that would invalidate a contract. 9 U.S.C. § 2; 42 Pa. C.S. § 7303. The Court must look to state law to make this determination. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002). "Under Pennsylvania law, an arbitration provision is unenforceable on the grounds of unconscionability if two elements are met: (1) the contractual terms are unreasonably favorable to the drafter, and (2) there is no meaningful choice on the part of the other party regarding acceptance of the provisions. The first element is referred to as substantive unconscionability, while the second is known as procedural unconscionability." *Lucey v. FedEx Ground Package Sys., Inc.*, 305 Fed. Appx. 875, 877 (3d Cir. 2009). Both elements are met here.

First, the arbitration agreement is substantively unconscionable as they are unreasonably favorable to Holt, the drafter of the IASA. For instance, Holt's ADR procedure provides that "[d]uring all stages of any . . . arbitration process . . . each party is solely responsible for any and all attorney fees, costs, and disbursements that party has incurred on its own behalf." Ex. 1 § 15.4.3. As the Third Circuit has made clear, however, "[p]rovisions requiring parties to be responsible for their own expenses, including attorneys' fees, are generally unconscionable because restrictions on attorneys' fees conflict with federal statutes providing fee-shifting as a remedy." *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 230-31 (3d Cir. 2012).

Holt's arbitration clause would also have Plaintiffs—a married couple of modest means caring for a child with special needs—"bear significant costs and fees associated with the arbitration process." *Giordano v. Pep Boys--Manny, Moe & Jack, Inc.*, 2001 WL 484360, at *4 (E.D. Pa. Mar. 29, 2001). Specifically, it would require Plaintiffs to be "responsible for one-half

the total fees and expenses charged by the arbitrator." Ex. 1 § 15.4.2; *see generally Giordano,* 2001 WL 484360, at \*7 (E.D. Pa. Mar. 29, 2001) (finding that "that the cost-sharing provision in the agreement is unenforceable because it functions as a deterrent to plaintiff's vindication of his claims through arbitration"); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 605 (3d Cir. 2002) ("Arbitration costs are directly related to a litigant's ability to pursue the claim"). Moreover, Holt's arbitration clause would require Plaintiffs from Pottstown, Pennsylvania to travel to "Lane County, Oregon" requiring significant time and travel expenditures. Plaintiffs have already incurred enormous expenses, due to Holt's conduct, owing to this disrupted adoption. Every term of the subject arbitration provision vastly favors Holt, a sophisticated international business, over Plaintiffs.

The arbitration provision is also procedurally unconscionable. "Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and ***convoluted or unclear language***." *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 265 (3d Cir. 2003). "This element is generally satisfied if the agreement constitutes a contract of adhesion[,]" meaning an agreement "which is prepared by the party with excessive bargaining power who presents it to the other party for signature on a take-it-or-leave-it basis." *Id.*

Here, there can be no dispute that Holt's IASA was, and is, a contract of adhesion. The IASA, and the arbitration clause contained therein, was prepared by Holt and given to Plaintiffs without any opportunity to negotiate its terms. *See* ¶¶ 37, 44, 58. And as discussed in the preceding section herein, the ADR procedure, as incorporated by the Placement Agreement, is rife with convoluted or unclear language such that Plaintiffs cannot have, and did not, appreciate the procedure's scope. The Court need look no further than Defendant's own Motion to see that, even

if Defendant's understanding with respect to arbitrability is correct (which, again, it is not), such a conclusion requires nothing less than a highly complex and layered exercise of contract interpretation.

     **D.    Should the Court be inclined to enforce Holt's arbitration clause, the just solution is to transfer the case to the United States District Court for the District of Oregon, not dismiss it outright.[12]**

Plaintiffs acknowledge that this Court may not issue an order under 9 U.S.C. § 4 compelling arbitration in Oregon given the Third Circuit's position that the FAA precludes a district court from compelling arbitration outside its geographic jurisdiction. *See Econo-Car Int'l v. Antilles Car Rentals*, 499 F.2d 1391, 1394 (3d Cir. 1974). The Court should decline, however, to dismiss Plaintiffs' Complaint on that basis. Instead, if the Court finds that Holt's arbitration clause is applicable and enforceable notwithstanding the foregoing, the Court should transfer the action to the United States District Court for the District of Oregon so that it may promptly issue an order compelling arbitration and staying the proceedings under 9 U.S.C. § 4. This court has "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995); *see, e.g.*, "*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 52 (2013) ("a forum-selection clause may be enforced by a motion to transfer under § 1404(a)"); *Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co.*, 628 F. Supp. 2d 674, 685 (E.D. Va. 2009) (denying defendant's 12(b)(6) "Motion to Dismiss to Compel Arbitration" in

---

[12] To the extent the Court reaches Defendant's invocation of its forum selection clause, the Court should also transfer the case under 28 U.S.C. § 1404(a). See *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 (2013) (when faced with a presumptively "valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause.").

contractually selected New York forum, and instead transferring the case under Section 1404(a) "in the interest of justice"); *Optopics Lab'ys Corp. v. Nicholas*, 947 F. Supp. 817, 826 (D.N.J. 1996) ("This Court will therefore transfer venue to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a) so that that court may compel arbitration before the contractually chosen Philadelphia tribunal" and staying non-arbitrable claims).

Dismissal of Plaintiffs claims, even without prejudice as Defendant requests, would only serve to further protract an already excruciating experience for Plaintiffs and delay vindication of their rights. If this Court finds that Holt's arbitration clause is applicable and enforceable, it should transfer the case and stay any remaining non-arbitrable claims.

In any event, if the Court declines to enforce Holt's arbitration clause, as it should, its forum selection clause should be equally rejected. In *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995), the Third Circuit provided the relevant "private and public" factors courts must consider in weighing whether to enforce a contractual forum selection provision. "The relevant private interests include: (1) each party's forum preference; (2) where the claims arose; (3) the convenience of the parties; (4) the convenience of the witnesses; and (5) the location of the books and records." *Washington Frontier League Baseball, LLC v. Frontier Pro. Baseball, Inc.*, 2017 WL 565001, at *1 (W.D. Pa. Feb. 13, 2017) (citing *Jumara*, 55 F.3d at 879). "The cited public interests include: (1) the enforceability of the judgment; (2) practical considerations of expediting trial and reducing costs; (3) administrative difficulties in the two fora due to court congestion; (4) the local interest in deciding local controversies; (5) public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law." *Id.*

Taken together, the *Jumara* factors weigh plainly in favor of this litigation proceeding in this Court. *See also Silvis v. Ambit Energy, L.P.*, 90 F. Supp. 3d 393, 399 (E.D. Pa. 2015) ("courts

have given preference to fora that have deeper ties to the allegations—particularly when those fora have historically and actively regulated the conduct or parties at issue.") The Court should decline to enforce Holt's forum selection clause where the forum selected has no meaningful connection to the allegations or claims in Plaintiffs' Complaint.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss or, in the alternative, transfer the action to the United States District Court for the District of Oregon.

Dated: December 12, 2025                    Respectfully submitted,


*/s/ A. Spencer Osborne*
A. Spencer Osborne (Pa. I.D. 336574)
Glenn F. Rosenblum (Pa. I.D. 23770)
**MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP**
1735 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
(215) 772-1500
sosborne@mmwr.com
grosenblum@mmwr.com

*Counsel for Plaintiffs Benjamin T. Irwin and Angela M. Colasanti*